UNITED STATES *v.* W. F. MACKAY (No. 4545)[1]

[1] C. A. D. 355.

128

United States Court of Customs and Patent Appeals, January 7, 1947

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks*, special attorney, of counsel), for the United States.

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for appellee.

[Oral argument December 10, 1946, by Mr. Weeks and Mr. Schwartz]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal by the Government from the judgment of the United States Customs Court, Third Division (C. D. 986), sustaining a protest filed by appellee. The effect of the judgment is to award recovery of moneys collected as customs duties upon a shipment of fish, known as tullibees, brought into the United States from Canada by railway and entered (consumption entry) for duty assessment at Noyes, Minn., March 17, 1941, the assessed duties being paid on that day. The entry was liquidated April 18, 1941. Protest was duly filed based upon the subsequent return of the merchandise to the Canadian shipper.

It appears from the entry papers that the importer of the fish was "Northern Fish Products" of St. Paul, Minn., for which appellee Mackay acted throughout as customs broker.

The issue presented is one of law under an undisputed state of facts, succinctly recited in the decision of the trial court from which we quote the following:

A carload of frozen fish of three different varieties was brought into the United States at the subport of Noyes, Minn. All of the fish were entered and assessed for duty at the rate of three-fourths of 1 cent per pound under paragraph 717 of the Tariff Act of 1930 as modified by the trade agreements with Canada, T. D. 48033 and T. D. 49752. A portion of the importation consisted of 232 boxes of frozen tullibees. As to these the representative of the Federal Security Administration was not satisfied that the sample submitted under the provisions of the Food, Drug, and Cosmetic Act (U. S. C. title 21, section 381) and the regulations promulgated thereunder, was representative of the merchandise and therefore required that all of the tullibees be forwarded to Minneapolis for inspection. The plaintiff, rather than comply with the request, exported the tullibees under customs supervision and now claims a refund of the duties paid on those fish. The collector of customs refused to refund the duties apparently because a consumption entry had been made and a delivery permit issued for the tullibees in question prior to their exportation to Canada.

Plaintiff contends that duties should be refunded because the fish in question were not "released from the custody of the Government" within the contemplation of section 558 of the Tariff Act of 1930 as amended by the Customs Administrative Act of 1938.

The pertinent statutory provisions of section 558 of the Tariff Act of 1930 as amended by the Customs Administrative Act of 1938 read as follows:

### SEC. 558. NO REMISSION OR REFUND AFTER RELEASE OF MERCHANDISE

(a) No remission, abatement, refund, or drawback of estimated or liquidated duty shall be allowed because of the exportation or destruction of any merchandise after its release from the custody of the Government, except in the following cases:

(1) When articles are exported with respect to which a drawback of duties is expressly provided for by law;

(2) When prohibited articles have been regularly entered in good faith and are subsequently exported or destroyed pursuant to a law of the United States and under such regulations as the Secretary of the Treasury may prescribe; and

(3) When articles entered under bond, under any provision of law, are destroyed within the bonded period as provided for in section 557 of this Act, or are destroyed within the bonded period by death, accidental fire, or other casualty, and proof of such destruction is furnished which shall be satisfactory to the Secretary of the Treasury, in which case any accrued duties shall be remitted or refunded and any condition in the bond that the articles shall be exported shall be deemed to have been satisfied.

(b) When articles are exported or destroyed under customs supervision after once having been released from customs custody, as provided for in subsection (c) of section 304 of this Act, such exportation or destruction shall not exempt such articles from the payment of duties other than the marking duty provided for in such subsection (c).

Article 1079 of the Customs Regulations of 1937, as amended by T. D. 49658, in force at the time of the involved transaction, reads:

Art. 1079. Continuous Custody.—(a) Tariff Act of 1930, section 558 (a), as amended by the Customs Administrative Act of 1938, section 24: [558 (a) as set forth above].

(b) Duties (except additional duties for undervaluation) may be remitted or refunded upon the exportation of imported articles which have remained continuously in customs custody from the time of importation to the time of exportation, unless such articles have become subject to sale as unclaimed or abandoned merchandise.

(c) Merchandise which has been released to an importer under the bond prescribed by article 314 of these regulations, and returned to the appraiser's stores upon requisition of the collector, and merchandise released under 6 months' bond, as provided for in section 308 of the Tariff Act of 1930, has not been in the continuous custody of customs officers.

(d) Merchandise which remains upon the wharf by permission of the collector is in customs custody. This custody ceases when the permit has been accepted by the customs officer in charge, and there is nothing further to be done by him in the way of measuring, weighing, gauging, etc.

(e) In the case of merchandise entered for warehouse, customs custody ceases when the storekeeper with whom a delivery permit has been lodged has released the merchandise to or upon the order of the proprietor of the warehouse, as provided in articles 331 and 933 (a) and (b).

(f) Except as provided by paragraph (d) of this article, merchandise examined elsewhere than at the public stores in accordance with the provisions of article 770 is released from customs custody when final examination for purposes of appraisement has been completed.

The Federal Food, Drug, and Cosmetic Act (June 25, 1938, c. 675, § 152, Stat. 1040) is administered by the Department of Agriculture. It provides for a Federal Security Administrator and defines his duties.

Paragraphs (a) and (b) of section 381 (U. S. C., title 21, sec. 381) thereof, under the heading "SUBCHAPTER VIII—IMPORTS AND EXPORTS," read:

§ 381. Imports and exports—Imports; examination and refusal of admission

(a) The Secretary of the Treasury shall deliver to the Federal Security Administrator, upon his request, samples of food, drugs, devices, and cosmetics which are being imported or offered for import into the United States, giving notice thereof to the owner or consignee, who may appear before the Federal Security Administrator and have the right to introduce testimony. If it appears from the examination of such samples or otherwise that (1) such article has been manufactured, processed, or packed under insanitary conditions, or (2) such article is forbidden or restricted in sale in the country in which it was produced or from which it was exported, or (3) such article is adulterated, misbranded, or in violation of section 355, then such article shall be refused admission. This paragraph shall not be construed to prohibit the admission of narcotic drugs the importation of which is permitted under section 173 of this title.

Same; disposition of refused articles

(b) The Secretary of the Treasury shall refuse delivery to the consignee and shall cause the destruction of any such article refused admission, unless such article

is exported by the consignee within three months from the date of notice of such refusal, under such regulations as the Secretary of the Treasury may prescribe: *Provided*, That the Secretary of the Treasury may deliver to the consignee any such article pending examination and decision in the matter on execution of a bond as liquidated damages for the amount of the full invoice value thereof together with the duty thereon and on refusing for any cause to return such article or any part thereof to the custody of the Secretary of the Treasury when demanded for the purpose of excluding it from the country or for any other purpose, such consignee shall forfeit the full amount of the bond as liquidated damages.

It may be said that paragraph (d) dealing with exports relates only to domestic merchandise intended for export and has no bearing in the instant case.

It appears that the merchandise was entered at Noyes March 17, 1941, and that it was inspected on that day by the customs inspector, who withdrew samples to be forwarded to the Food and Drug Inspection Service at Minneapolis in conformity with the requirement of section 381 (a), *supra*. It is not clear from the record just when the samples reached the administrator, but it is stated in the protest that the merchandise "was returned to Canada under withdrawal Entry No. 80 A of March 20, 1941, because of the action of the Chief Inspector of the Food and Drug Inspection Service * * *." So, evidently, the transaction was carried out with reasonable promptness.

The tullibees were returned to Canada in the same car in which they were shipped into the United States, never having been removed therefrom. The car remained on a track in the railroad yards at Noyes (where the customs inspector examined the merchandise) from the time of the entry to the time it was shipped back to Canada.

At the instance of counsel for appellee there was introduced in evidence a document referred to as a report of the chief of the Minneapolis station of the Food and Drug Inspection Act, dated "3–22–41." Apparently, the document was intended to be an explanation to the Collector of Customs (we suppose the collector at the subport of Noyes Minn.) of the attitude of the Food and Drug Inspection Service respecting the release of the tullibees, the duty upon which is here involved. We quote the following from the document:

This Station could not give a release on this sample of fish since we were not certain that the Customs sample was representative of the entire lot contained in the car, and we notified the Railroad Co. that when the car reached St. Paul, Minn. we would thoroughly investigate the car and could then release the shipment if no infested fish were concealed in the car. This information was transmitted to the Foreign shipper and the importer. We were later advised by the R. R. Co. that they were unable to obtain a guarantee that the freight to St. Paul would be paid if the shipment was rejected and sooner than submit the fish to reinspection at destination we were informed that the car was being returned to the Country of origin. Accordingly, this form is sent as a matter of record only.

From the foregoing it would seem that the Food and Drug official at Minneapolis had anticipated that the car would be transported to St. Paul and that it was intended to inspect the tullibees there. Seemingly, the other types of fish in the car did not require inspection. It appears that they were unloaded at Noyes. Only the tullibees are here involved.

It is noted that the chief of the service at Minneapolis stated in the report that notice was given to the "Railroad Company," and it appears from the testimony of Mr. Mackay that on March 18 (the day after the entry had been made and the assessed duties paid) the traffic officials of the railroad company called him by telephone and advised him of the attitude of the Food and Drug Inspection Service. Certain of his testimony relative to what was said in the conversation was properly held by the trial court to have been hearsay and without probative value, but it is clear that the tullibees had not been released by the Food and Drug Administrator. It is not disputed that the tullibees were exported under customs supervision.

Upon what may be designated as the customs duty phase of the controversy the trial court after a discussion of the testimony held that the tullibees had been released from customs custody, but it drew a distinction between *customs* custody and *Government* custody, saying:

> The court is of the opinion and so holds that the goods were released from customs custody. However, section 558, *supra*, does not prohibit refund of duty on merchandise such as is involved in this case because of exportation after its release from the custody of the customs, but after its release from the custody of "the Government." The statement of the Food and Drug Inspection Service Chief, set forth above, clearly indicates that after examination of the car the Pure Food and Drug officials "could then release the shipment if no infested fish were concealed in the car," indicating that until then they could not release it. Therefore, it is clear that in this case the goods had not been released from "the custody of the Government," and the provisions of section 558, *supra*, do not preclude the refund of the liquidated duty on the tullibees. Inasmuch as the record discloses that the tullibees were exported under customs supervision, it is the opinion of the court and we so hold that the collector should have refunded the amount of duty found due upon liquidation and paid upon that merchandise.

Before us it is contended on behalf of the Government, in substance, that the phrase "custody of the Government," used in section 558, *supra*, means customs custody, and that there had been a release of the merchandise from customs custody.

Counsel for appellee seemingly does not concede that the merchandise had been released from customs custody, and urges that the issue here is controlled by the decision of this court in the case of *Fenton Co. et al.* v. *United States*, 14 Ct. Cust. Appls. 277, T. D. 41885, but argues that in any event the trial court was correct in

holding that the tullibees had not been released from the custody of the Government. The trial court discussed the *Fenton* case and, pointing out the difference between the facts there shown and those here shown, held that it was not controlling here.

As we view the issue, it is immaterial here whether or not it be held that the merchandise had been technically released from customs custody so far as customs duties are concerned.

Assuming that all the functions of the customs officials as agents of the Treasury Department respecting the *collection of duties* had been exercised, it must be remembered that certain duties other than those relating to the collection of revenues are imposed upon customs officials in connection with the Food, Drug, and Cosmetic Act.

When Congress enacted the Food, Drug, and Cosmetic Act it saw fit to place its administration under the Department of Agriculture, but with respect to imports it was necessary to provide for samples to be inspected by officials of the Department of Agriculture not for duty purposes, but for the purpose of enforcing the Food, Drug, and Cosmetic Act. Had it chosen to do so Congress might have provided Agricultural Department inspectors at the docks of every port just as there are Treasury Department (customs) inspectors, but the obviously simpler and more convenient plan was adopted of having the Secretary of the Treasury (of course, acting through customs officials) furnish samples to the Federal Security Administrator.

So, it may be said that a duty additional to that relating to the revenues was imposed upon customs officials as to imported merchandise subject to the Food, Drug, and Cosmetic Act. Such duty is purely administrative and requires no exercise of discretion, nor the making of any decision. It is simply to furnish samples which form the basis of the Federal Security Administrator's action, but it must be complied with in order that the Administrator may function.

The statute does not prescribe the number of samples and, so far as is here disclosed, the Administrator acted within the scope of his authority in refusing to rule upon the basis of the samples sent him, and, in effect, requiring submission of the entire shipment of tullibees for his inspection.

It would seem, therefore, that although the customs officials at Noyes doubtless acted in good faith and seemingly followed the usual custom in selecting and forwarding samples, there had not, in fact, been a compliance with that portion of section 381 (a), *supra*, requiring the delivery of samples at the time of the so-called release from customs custody, and not having samples satisfactory to himself the Federal Security Administrator had not released the merchandise.

We think section 558 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, and section 381 (a) and (b)

must, in cases such as this, be construed *pari passu* and that both must be given force and effect in determining whether there has been a release of merchandise from "the custody of the Government."

It is noted that when the Federal Security Administrator rejects merchandise "imported or offered for import" it is made the duty of the Secretary of the Treasury by section 381 (b), *supra*, to refuse delivery of it to the consignee and cause its destruction unless exported within three months, with a proviso, however, permitting delivery upon the execution of a bond conditioned as described.

It is said that in the instant case appellee had on file what is referred to as a term bond, not referring specifically to the importation here involved but sufficient to comply with the conditions of the proviso. The bond was not made a part of the record before us but there seems to be no question as to its character. Whatever its precise form it, obviously, was executed before any samples had been submitted to the Federal Security Administrator and at a time when neither the importer nor the customs officials had any reason to suppose that the samples forwarded as was customary would not be accepted as sufficient.

We are of opinion that there is nothing in the statutory provisions nor in the provisions of the regulations which should be held to prevent the exportation of merchandise and the refund of duties paid on it under circumstances such as those in the case at bar. As soon as appellee learned that the samples which the customs inspector had selected and caused to be forwarded would not be accepted as sufficient he proceeded to return the tullibees to the country of origin, under customs supervision.

It has not been suggested that there was any effort or purpose on the part of the appellee to defraud the Government in the matter of revenue or to introduce bad fish into the commerce of the United States. The Food and Drug Administrator gave no reason for his refusal to accept the samples other than saying "we were not certain that the Customs sample was representative of the entire lot contained in the car." The customs inspector, not the importer, of course, selected the sample or samples. Appellee had no way of knowing whether or not the fish would reach Minneapolis or St. Paul (which judging from a map is 300 or more miles from Noyes) in the condition in which it arrived at Noyes, and it seems to us that he was within his rights, so far as the United States Government is concerned, in exporting the merchandise immediately without submitting the matter to further action by the Food and Drug Inspection Service.

A further contention on behalf of the Government is that "No statutory authority permits a refund of duties on merchandise which

has been released from customs custody and thereafter exported though still in Government custody."

In other words, as we understand the position of counsel for the Government, it is that even though the merchandise be held to have been in the custody of the Government at the time it was exported because the proper agency of the Department of Agriculture had not released it, there is no statutory authority for directing a refund of the duties collected at the time of importation upon its exportation under customs supervision.

To sustain this position of Government, counsel obviously would, in effect, obliterate the distinction which, as we view it, exists between customs custody for purely customs purposes and Government custody for other purposes.

Had the Food and Drug Administrator released the merchandise after inspecting it that would have completed the release from Government custody for all purposes and appellee, so far as the record before us discloses, would not have been entitled to a refund, but having been exported under customs supervision while still in Government custody we are of opinion that the trial court reached the correct conclusion.

Accordingly, the judgment appealed from is *affirmed*.